# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40155**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Larry KITCHEN, Jr.**
Major (O-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 3 February 2023

————————————

*Military Judge*: Christopher M. Schumann (arraignment); Christina M. Jimenez (trial).

*Sentence*: Sentence adjudged 9 April 2021 by GCM convened at Cannon Air Force Base, New Mexico. Sentence entered by military judge on 5 May 2021: Dismissal, confinement for 24 months, and forfeiture of all pay and allowances.

*For Appellant*: Major Jenna M. Arroyo, USAF.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Major Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and CADOTTE, *Appellate Military Judges*.

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge POSCH and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Judge:

A general court-martial comprised of officer members convicted Appellant, contrary to his pleas, of one specification each of attempted sexual abuse of a child on divers occasions and attempted sexual assault of a child in violation of Article 80, UCMJ, 10 U.S.C. § 880.[1,2] The military judge sentenced Appellant to a dismissal, 24 months of confinement, and forfeiture of all pay and allowances. The convening authority suspended adjudged forfeitures and waived automatic forfeitures for the benefit of Appellant's dependents, but otherwise did not disturb the adjudged sentence.

Appellant raises four assignments of error, claiming: (1) Appellant was deprived of a right to a unanimous verdict; (2) the military judge erred in instructions to the court members on the charged offenses; (3) the convictions for attempted sexual abuse of a child and attempted sexual assault of a child are legally and factually insufficient; and (4) the trial counsel committed prosecutorial misconduct through his findings argument. We have carefully considered issue (1) and determine no discussion or relief is warranted. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at \*50–57 (A.F. Ct. Crim. App. 25 Mar. 2022) (unpub. op.) (finding unanimous court-martial verdicts not required), *rev. granted*, 82 M.J. 440 (C.A.A.F. 2022). We find no material prejudice to a substantial right of Appellant and that Appellant is not entitled to relief.

## I. BACKGROUND

Appellant was a 43-year-old pilot stationed at Cannon Air Force Base (AFB), near Clovis, New Mexico, and at the beginning of the charged time period was deployed to Africa. He used a messaging application, Skout, which identifies other Skout users in the vicinity of the user who want to chat. Users can click on the profile of another user and initiate a chat. The user's location is customizable. Appellant's profile picture was a head-and-shoulders photograph of a man in Air Force service dress uniform. His rank, badges, and

---

[1] Unless otherwise noted, all references in this opinion to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The court members found Appellant not guilty of certain excepted language relating to the location alleged in one specification. Additionally, consistent with his pleas, Appellant was found not guilty of the other two specifications relating to Megan charged in violation of Article 80, UCMJ.

awards and medals were discernable. Another photograph was of a black Mustang vehicle with decals depicting the comic book Spawn. Appellant's name on Skout was "Spawnstang."

On 14 September 2019, Air Force Office of Special Investigations (AFOSI) Special Agent (SA) JN created a Skout account using a persona called "Megan" as part of an undercover operation in support of mitigating Internet crimes against children (ICAC). SA JN explained, "So once I was on the Skout application, I went to the [']wants to chat,['] and at the time my persona was scrolling through and noticed [Appellant], and clicked on the profile and said hello - - or said 'Hi!'" Soon thereafter, Megan told Appellant she was almost 15 years old and lived with her mother on base. Appellant engaged in message conversations with Megan, first on Skout and then on Kik, another messaging application. The conversations quickly became sexual in nature. Ultimately, the messages led to a plan for Appellant and Megan to meet in person upon his redeployment and engage in sexual activity. The day Appellant redeployed to Clovis, on 20 September 2019, Appellant drove to their prearranged meeting place in enlisted housing on Cannon AFB where AFOSI agents apprehended him, still in his car. Agents located condoms in Appellant's vehicle.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the sufficiency of the convictions on two bases: the Government did not prove beyond a reasonable doubt that Appellant (1) was not entrapped, and (2) had the specific intent to commit the target offenses. We resolve these issues adverse to Appellant and conclude the convictions are legally and factually sufficient.

#### 1. Additional Background

After Megan first contacted Appellant on Skout, stating "Hi!," Appellant responded and a conversation ensued.[3]

> Appellant: How are you
>
> Megan: I'm doing good, just bored lol. How r u?
>
> Appellant: I'm bored too. I'm okay. Currently deployed. Will be back next weekend.
>
> Appellant: How old are you?

---

[3] We transcribe the messages verbatim, to include misspellings and compressing words and phrases. We note SA JN testified that "Nd" means "and."

Megan: Oh wow! Be safe plz!! Nd I'm almost 15! Wbu?!

Appellant: Oh wow that sucks. I'm 33

Appellant: And thanks

Appellant: What made you message me?

Megan: Idk just wnt to meet new ppl, I'm kinda new here.

Appellant: I completely understand that

Megan: Nd ur car is kinds cool! It's realy different

Appellant: Oh thanks. I appreciate it. I love working on it

Megan: So how long hve yu been here? Nd Wht is there to do lol

Appellant: Not much really. I always leave out of town. Your parents would not be happy if you're talking to me. I can imagine it's hard chatting with people your age on here because they are more than likely not on here.

The conversation continued, with Megan stating she and her active-duty mother lived on base, she was home alone for much of the day, and she went to school off base. They talked about what activities were offered around town. Appellant said he was returning from his deployment the following week. After Appellant said he typically stayed up late, he said, "It sucks your so young. I've had a better conversation with you than with most women on here. That's horrible." Megan did not respond right away; she explained she went for a run and responded, "Hehe why does it suck?! And well ppl on here can be boring…" Megan also said, "I like talking to you too!" In response, Appellant said, "It just sucks cause I can't ever meet you." The conversation continued:

Megan: Thanks and awe why not?!

Appellant: Because I have a lot to lose. I'm an officer. A pilot in the Air Force. Your mom would go nuts on us

Megan: She would nvr find out it can b out secret! [two emojis]

Appellant: My bar is bi secret. It's not easy sneaking in anywhere with that car.

Appellant: You don't think your mom have alarms or people watching your house

Megan: I can always sneak out. Nd she doesn't lol it's kinda weird family

Appellant: Have you sneak out all ready?

Megan: Yep [two emojis] don't tell on me hehe

> Appellant: Lolol I'm scarred to get in trouble. How do you look
> like?
>
> Megan: Wel I don't Wht to get in trouble either Nd I'm short,
> with dark hair. Kinda tan "It's going away [two emojis]"
>
> Appellant: Send me a pic

They talked about whether Megan told anyone about talking to Appellant. Appellant repeatedly asked her how she looked and asked for a photo. He verified that her parents did not monitor her messaging accounts. Appellant sent her a photo of himself, and Megan's response was, "Oh I got it!" When Megan finally did send Appellant a photo—from shoulders to thighs—Appellant responded, "Well you are pretty sexy" and, "I like your shape."[4]

Appellant and Megan moved their conversation to another messaging application, Kik. Appellant told Megan his living quarters were cold, which did not "make it easy to sleep with no clothes." He then asked Megan what she normally wore to bed, to which she responded, "PJs."

The subject of Megan sneaking out of her house came up again. After Megan said she typically stayed up late, the following exchange ensued:

> Appellant: We will see about that
>
> Megan: Haha yeah?
>
> Appellant: Yup.
>
> Megan: Nd how will we see about tht? [emoji]
>
> Appellant: I don't know. You'll figure out a way to sneak out
>
> Megan: Hehe i can sneak out.. when would u wnt me to?
>
> Appellant: Oh wow.
>
> Appellant: Really?
>
> Megan: Yeah realy? Lol she works overnight so it's easy
>
> Appellant: What days?
>
> Appellant: How long can you stay?
>
> Appellant: And what do you want to do?
>
> Megan: Monday through Friday night Nd Wel I can stay out late
> but I hve to b bck for school lol

---

[4] SA JN got consent from AE—at the time a 21-year-old Airman—to take and use photos of her to send to Appellant as "Megan."

> Megan: Nd idk.. I'm open to really anything wht do u wnt to do?

Appellant asked Megan when she needed to be back so she did not miss school, what time her mother worked, and whether her mother ever returned early. Then they discussed what they would do if they met:

> Appellant: Well if can get you out by 8 maybe we can go grab something to eat. We can hit up a movie and the theater or go by my house and watch some Netflix.
>
> Megan: That would be so much fun!! Wht would we do at ur house?
>
> Megan: Nd do you live close?
>
> Megan: I wouldnt want to b seen at the movie theatre..
>
> Appellant: I actually live in the town of Clovis. We can do whatever you want. I have a bunch of movies. We can order some food. Get under the covers and watch anything you want
>
> Megan: Okay good. I was worried you lived like rely far lol. Nd I would like that.
>
> Megan: Nd under the covers? [two emojis]
>
> Appellant: We don't have to get under the covers if you don't want.
>
> Megan: I'm alright with that hehe
>
> Megan: [eyes covered emoji]
>
> Appellant: I'm nervous

Their conversation soon turned sexual:

> Appellant: Do you like to cuddle?
>
> . . . .
>
> Megan: Nd I do [two emojis]
>
> Appellant: Okay cool
>
> Megan: Do u?
>
> Appellant: I do like to cuddle. Just not sure if I would be a good cuddler coming off this deployment
>
> Megan: Awe why's tht
>
> Appellant: It's been a while since I've been around a female. So cuddling will probably get me hard and it may poke you.
>
> Megan: Oh yeah…? [eyes covered emoji] hehe

6

Appellant: Hehehe it will be embarrassing [emoji]

Megan: Lol don't be embarrassed ….

Appellant: It will be hard not to be but I will try. I love cuddling but I don't know how's my body going to react

Megan: Hehe it's okay…

Appellant: You sure?

Megan: I'm sure!!

Appellant: Damn, send me more pics of you

Megan said she was "just curious wht were gunna do" and that she was nervous and excited. Besides cuddling, watching movies, and eating, Appellant asked, "What else would you like to do?"

Megan: Idk. I'm open to suggestions.. Wht else would u like to do?

Appellant: Truthfully I don't know. My brain cells are not firing on all cylinders because I'm hard now [emoji]

. . . .

Appellant: Ok so we're cuddling and all of sudden you feel something hard against your back and it starts rubbing against you

Megan: Yeah… wht else?

Megan: Nd rubbing where hehe?

Appellant: Like between your legs [emoji]

As their conversation continued, Appellant told Megan, "I don't want to take away your virginity like that," "[e]ven though I would be super hard." After Appellant confirmed from Megan that she was "down" for that and that he would be "allow[ed] to touch" her, he listed where he would touch her, including between her "booty" and legs. Eventually, Appellant described how he would commit various sexual acts with her, including penetrating her vulva with his penis. The subject of condoms came up:

Megan: R u going to wear a condom?..

Appellant: Yes because you're not on the pill most likely

Megan: No I'm not on the pill

Megan: Okay good I jst dnt wnt to get pregnant hehe

Appellant: You shouldn't get pregnant. I had surgery that won't let have kids unless I want to reverse it.

Megan: Thts a thing?!

Appellant: It sure is.

Megan: Oh wow okay! Wel do we should def still use a condom…
just in case

Appellant: Yes of course

Megan: [two emojis] When r we meeting?!

Appellant expressed some reservation about meeting Megan because of her age, but more so because she did not send him a photo of her face. In the context of meeting up with someone for sexual activity whose face he had not seen and who he had never met in person, Appellant stated that he had "never done this before." After Megan wondered if Appellant was mad at her for not sending a photograph of her face, he stated:

> I'm not mad or disappointed. The truth is that thing that caught my attention of you is your conversation, your thoughtfulness and kindness. The women I have met today do not have that at all.

> Your age is probably my biggest turn off but you are so engaging in your conversation makes me forget that.

> But I can't forget it at all. Me, I have so much to lose. And a very successful career. The thought of not seeing your face gives me some doubt that's all.

Appellant continued to worry about getting caught, and ran Megan through scenarios, such as what she would do if her mother called, knew she was not at home, and asked where she was. Then Appellant predicted his eventual fate:

Appellant: I'm so nervous

Megan: Why?!

Megan: Dnt b.. [emoji]

Appellant: So scared this is a setup or something

Megan: Wht do u mean?

Appellant: Like show up to meet you and then I get arrested or something

Megan: [Two emojis] tht would b terrible!!!

Megan did not admit to Appellant she was actually a law enforcement officer, but—without actually lying—led him to believe she was not. They continued to shape a plan to meet upon Appellant's return to Clovis.

Appellant kept in touch with Megan as he made his way from Africa, through Europe, to the United States, and to his home. Megan sent Appellant a map showing the location on Cannon AFB where they could meet. After Appellant stated he was nervous, he said, "I won't do anything. I'll let you make the moves if you want to," to which Megan replied she was nervous and excited and, "Wel I liked Wht u said we were gunna do [hands covering eyes emoji]." Appellant asked if she was sure because, "that's me all over you." She assured him she was. After finding some clothes (his luggage did not make his flight) and a working vehicle (the Mustang was not operating properly), Appellant messaged Megan that he was ready and then driving. The last two messages consist of Megan stating, "I'm waiting," and Appellant replying, "I'm here."

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). The evidence supporting a conviction can be direct or circumstantial. *See United States v. Long*, 81 M.J. 362, 368 (C.A.A.F. 2021) (citing R.C.M. 918(c)) (additional citation omitted). "[A] rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *Id.* at 369 (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). The "standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citation omitted).

"The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of the appellant's guilt beyond a reasonable doubt." *Rodela*, 82 M.J. at 525 (alterations, internal quotation marks, and citation omitted). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of inno-

cence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017), *aff'd* 77 M.J. 289 (C.A.A.F. 2018) (alteration in original) (quoting *Washington*, 57 M.J. at 399). "The term reasonable doubt . . . does not mean that the evidence must be free from conflict." *Id.* (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

In order to convict on an attempt offense under Article 80, UCMJ, the Government is required to prove beyond a reasonable doubt that the accused did a certain overt act, that the act was done with the specific intent to commit a certain offense, that the act amounted to more than mere preparation, and that the act apparently tended to effect the commission of the intended offense. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 4.b.

For Appellant to be found guilty of the offense of attempted sexual abuse of a child as charged in Specification 1 of the Charge, the Government was required to prove beyond a reasonable doubt all the elements of attempt, including that Appellant specifically intended to commit a lewd act upon Megan, a child who had not attained the age of 16 years, by intentionally communicating to Megan indecent language with an intent to arouse his sexual desire. *See MCM*, pt. IV, ¶¶ 62.b.(3), 62.a.(h)(5). The communication can be "by any means, including via communication technology." *MCM*, pt. IV, ¶ 62.a.(h)(5); 10 U.S.C. § 920b(h)(5).

For Appellant to be found guilty of the offense of attempted sexual assault of a child in Specification 3 of the Charge, the Government was required to prove beyond a reasonable doubt all the elements of attempt, including that Appellant specifically intended to commit a sexual act upon Megan, a child who had attained the age of 12 years but not 16 years, by penetrating Megan's vulva with his penis. *See MCM*, pt. IV, ¶ 62.b.(2)(a). A sexual act includes "the penetration, however slight, of the penis into the vulva." *MCM*, pt. IV, ¶¶ 62.a.(h)(1), 60.a.(g)(1)(A); 10 U.S.C. §§ 920b(h)(1), 920(g)(1)(A). The term "sexual act" also includes "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to [ ] arouse or gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 62.a.(h)(1); 10 U.S.C. § 920b(h)(1).

In cases involving attempts to entice minors to engage in sexual activity, "courts agree that travel constitutes a substantial step." *United States v. Winckelmann*, 70 M.J. 403, 407 (C.A.A.F. 2011) (citations omitted). Analyzing an attempted larceny conviction, the United States Court of Appeals for the Armed Forces noted it had "recognized that a substantial step could be comprised of something as benign as travel, arranging a meeting, or making hotel

reservations." *United States v. Hale*, 78 M.J. 268, 272 (C.A.A.F. 2019) (citing *Winckelmann*, 70 M.J. at 407).

Entrapment is an affirmative defense. Rule for Courts-Martial (R.C.M.) 916(g) states: "It is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense."

The defense has the initial burden of showing some evidence that an agent of the Government originated the suggestion to commit the crime. *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992). Once the defense of entrapment is raised, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense . . . ." *Id.* (citations omitted). When a person accepts a criminal offer without an extraordinary inducement to do so, he demonstrates a predisposition to commit the crime in question. *Id.* (citations omitted). "Inducement" means more than merely providing an appellant the means or opportunity to commit a crime. *United States v. Howell*, 36 M.J. 354, 360 (C.M.A. 1993) (citations omitted). Instead, the Government's conduct must:

> create[ ] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense. Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.

*Id.* at 359–60 (emphasis, internal quotation marks, and citations omitted).

The Government may use undercover agents and informants to ferret out crime and afford opportunities or facilities for criminals to act upon. *Jacobson v. United States*, 503 U.S. 540, 548 (1992); *Howell*, 36 M.J. at 358. "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932) (citations omitted); *see also United States v. Russell*, 411 U.S. 423, 435–36 (1973) (allowing for deceit as a law enforcement technique). For example, law enforcement officers may pretend to be someone other than a government agent. *See Howell*, 36 M.J. at 358. "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." *Russell*, 411 U.S. at 436.

When entrapment is raised at trial, "[t]he test to be applied [on appeal] is whether the evidence of record supports the factual determinations" that the defense did not apply. *United States v. Vanzandt*, 14 M.J. 332, 345 (C.M.A.

1982) (citations omitted). That is, an "appellant can only prevail by showing that these findings are incorrect as a matter of law." *Id.* (citation omitted).

### 3. Analysis

#### a. Entrapment

Appellant claims that he was entrapped into committing both offenses; specifically, he alleges Government inducement and his lack of predisposition. From our review of the evidence, and in particular the messages between Appellant and Megan, we are convinced Appellant was not entrapped.

Appellant points to the uncontradicted evidence that he had no history of or interest in sexual acts against children. While these factors are relevant, they are not dispositive. *See, e.g.*, *United States v. Hall*, 56 M.J. 432, 437 (C.A.A.F. 2002) (finding "the Government was not required to show that [the] appellant was generally predisposed to sell drugs, but only that he was predisposed to facilitate this particular transaction"). Appellant, not Megan, elevated the conversation from talking about things to do near Cannon AFB, to sneaking out to meet, to engaging in sexual activity upon meeting. Moreover, contrary to Appellant's assertion on appeal, the messages he sent to what he believed to be a 14-year-old girl do not portray a man "in a vulnerable place in his life." The evidence shows Appellant was predisposed to talk about sex and meet up for sex with a willing female; the age of the female appears to have been of little importance to him. Appellant's concern was meeting someone for sex whose face he had not seen, as well as getting caught. He did not appear to be concerned that he was actually committing a crime by communicating to a 14-year-old girl his sexual plans for her, or that he was planning to commit a crime by meeting and having sex with said girl. We find Appellant accepted "a criminal offer" without an extraordinary inducement to do so, displaying his "predisposition to commit" the crime in question. *See Whittle*, 34 M.J. at 208 (citations omitted). A rational factfinder could conclude the evidence proved beyond a reasonable doubt that Appellant was not entrapped to commit attempted sexual abuse or sexual assault of a child in this case. Indeed, Appellant's findings argument to the court members focused primarily on the defense of entrapment, and the convictions indicate it was rejected. Moreover, we are convinced Appellant was not entrapped.

#### b. Specific Intent

Quoting the military judge's instructions, Appellant claims the Government failed "to prove beyond a reasonable doubt that [Appellant's] overt act in driving to meet 'Megan' was 'done with specific intent to commit the offense of sexual assault of a child' . . . . by penetrating her vulva with his penis." Instead, he claims "[i]t is debatable whether [Appellant] himself knew what his intentions were the night he drove to meet 'Megan.'" We disagree.

The evidence—primarily the Kik messages—establishes that Appellant intended to have vaginal intercourse with a 14-year-old girl if she would let him, and she assured him she would let him.[5] The fact that he possessed condoms when he was apprehended in his vehicle lends support for this conclusion. We find that a rational factfinder could conclude the evidence proved Appellant's specific intent, as well as the other elements of the offense, beyond a reasonable doubt. Moreover, we are convinced Appellant had the requisite specific intent.

In conclusion, we find the convictions are legally sufficient. Moreover, having weighed the evidence in the record and having made allowances for not having personally observed the witnesses in this case, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Wheeler*, 76 M.J. at 568. Thus, we also find Appellant's convictions are factually sufficient.

## B. Findings Instructions

Appellant claims that the military judge erred in her instructions to the court members on the elements of the offenses in Specifications 1 and 3 of the Charge. Specifically, Appellant argues that "the military judge's instructions for the first element—the overt act—essentially mirrored the language of the intended offense." Put another way, Appellant notes "the overt act identified in element 1 of the attempted offense was the same act required for the target offense." We find Appellant waived this issue and are not persuaded to pierce that waiver.

### 1. Additional Background

The military judge provided counsel several opportunities to review, request, and object to instructions to the court members on findings. The military judge asked counsel whether they had any objections to her instructing on certain areas, including on the elements of the offenses. She also told them they "[would] all get an opportunity to read the[ instructions] and then [they] [could] discuss."[6]

---

[5] See Section C.2.a., *infra*, for a recitation of some of Appellant's messages on this point.

[6] The military judge stated: "I intend to give the following instructions: Obviously, the charged offenses and their elements. In that regard, it appears I do have some evidence of a mistake of fact as to age to the offenses, as well as impossibility. So I have those introductions [sic] in here. Counsel, just for your [situational awareness], I don't think any of you have you been in my courtroom before. We'll go through this now. You can object now. You will also be provided a draft copy, so do not think your objections are foreclosed just yet. And we will come back on and discuss those again this evening as well."

On the record, no party raised an issue with the military judge's proposed instructions on the elements, including overt acts. Appellant specifically requested instructions in a filing marked Appellate Exhibit LII. Regarding "overt acts," the Defense's proposed instruction read: "the accused did (a) certain act(s), that is: (state the act(s) alleged or raised by the evidence)." The military judge addressed counsel's specific requests, which for the Defense focused primarily on the defense of entrapment. The military judge sent counsel a draft of her instructions, and later discussed instructions with counsel before providing the instructions to the court members.

The military judge provided the court members instructions on all four elements of each specification, relevant definitions, and the elements of the attempted offenses. For the first element of Specification 1, the military judge instructed the court members that, for "the offense of attempted sexual abuse of a child involving indecent communication in violation of Article 80, [UCMJ,]" they needed to be convinced beyond a reasonable doubt of the following:

> One, that on divers occasions, between on or about 14 September 2019 and on or about 20 September 2019, within the continent of Africa, the continent of Europe, and the continental United States, the accused did a certain overt act, that is, attempt to commit a lewd act upon Megan, a person whom he believed to be a child who had not attained the age of 16 years by intentionally communicating to Megan indecent language with the intent to arouse his sexual desire.

For the first element of Specification 3, the military judge instructed the court members that, for "the offense of attempted sexual assault of a child in violation of Article 80, [UCMJ,]" they needed to be convinced beyond a reasonable doubt of the following:

> One, that on or about 20 September 2019, at or near Cannon Air Force Base, New Mexico, the accused did a certain overt act, that is, attempt to commit a sexual act upon Megan, a person whom he believed to be a child who had attained the age of 12 years but had not attained the age of 16 years, to wit, penetrating Megan's vulva with his penis.

Before the military judge provided the court members instructions on the specifications, she noted that counsel had indicated they had no objections. After reading the instructions to the court members, the military judge specifically asked counsel whether they "object[ed] to the instructions given or request[ed] additional instructions." Counsel for both parties stated "No, Your Honor." Trial defense counsel did not raise an issue with the instructions on

the elements. The court members did not ask the military judge questions about the instructions on the offenses.

### 2. Law

"Failure to object to an instruction or to omission of an instruction before the members close to deliberate forfeits the objection." R.C.M. 920(f). We review forfeited issues for plain error. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020). "[T]o establish plain error an appellant must demonstrate (1) error, (2) that is clear or obvious at the time of the appeal, and (3) prejudicial." *United States v. Long*, 81 M.J. 362, 369–70 (C.A.A.F. 2021) (internal quotation marks and citation omitted).

In contrast to forfeiture, an appellant waives a right to raise the issue on appeal where he "affirmatively declined to object to the military judge's instructions and offered no additional instructions," even "in regards to the elements of the offense." *Davis*, 79 M.J. at 331 (citations omitted). However, "when there is a new rule of law, when the law was previously unsettled, and when the [trial court] reached a decision contrary to a subsequent rule," we instead review for plain error. *United States v. Schmidt*, 82 M.J. 68, 72 (C.A.A.F. 2022) (alteration in original) (quoting *Davis*, 79 M.J. at 331). "Whether an appellant has waived an issue is a legal question we review de novo." *Id.* (citation omitted).

Generally, an affirmative waiver leaves "nothing left" to correct on appeal. *Davis*, 79 M.J. at 331 (citations omitted). However, pursuant to Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1), Courts of Criminal Appeals (CCA) have the unique statutory responsibility to affirm only so much of the findings and sentence that they find are correct and "should be approved." This includes the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018). A CCA assesses the entire record and determines "whether to leave an accused's waiver intact, or to correct the error." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016).

"The military judge has an independent duty to determine and deliver appropriate instructions." *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008) (citing *United States v. Westmoreland*, 31 M.J. 160, 163–64 (C.M.A. 1990)). This duty includes giving required instructions that "provide an accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted). "Whether a panel was properly instructed is a question of law reviewed de novo." *United States v. Hale*, 78 M.J. 268, 274 (C.A.A.F. 2019) (quoting *United States v. Medina*, 69 M.J. 462, 465 (C.A.A.F. 2011)).

15

Military judges are required to instruct court members on the elements of charged offenses. R.C.M. 920(e)(1). "When a military judge's instruction incorrectly describes elements of an offense, we analyze that error for prejudice under a standard of harmlessness beyond a reasonable doubt." *United States v. Forney*, 67 M.J. 271, 280 (C.A.A.F. 2009) (Effron, C.J., concurring) (citing *Neder v. United States*, 527 U.S. 1, 17 (1999)); *see also United States v. Payne*, 73 M.J. 19, 25 (C.A.A.F. 2014) (finding beyond a reasonable doubt that the omission of instructions on elements was not materially prejudicial). "This standard is met 'where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction.'" *United States v. Upshaw*, 81 M.J. 71, 74 (C.A.A.F. 2021) (quoting *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020)).

The elements of the offense of attempt, in violation of Article 80, UCMJ, are that: (1) the accused did a certain overt act; (2) the act was done with the specific intent to commit a certain offense under the UCMJ; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect the commission of the intended offense. *See MCM*, pt. IV, ¶ 4.b.(1)–(4). In charging an attempted offense under the UCMJ, it is not necessary to allege the overt act or the elements of the underlying target offense, as long as the "accused is aware of the nature of [that] offense." *United States v. Norwood*, 71 M.J. 204, 207 (C.A.A.F. 2012).

**3. Analysis**

The threshold question is whether Appellant preserved, forfeited, or waived his allegation of error in the military judge's instructions of the elements of Specifications 1 and 3. Trial defense counsel did not object to the challenged instructions, even when the military judge asked, so the issue was neither preserved nor forfeited. *See Davis*, 79 M.J. at 331. Instead, Appellant waived this issue, and we decline to pierce that waiver.

The military judge involved counsel in the drafting and tailoring of her instructions. She determined what kinds of instructions counsel wanted, she provided counsel with draft instructions, and she solicited objections to and requests for additional instructions. She considered Appellant's proposed draft instructions, which in essence asked the military judge to tailor the language regarding overt acts as she saw fit. After the military judge provided the instructions to the court members, she again asked counsel for objections, and received none. Because trial defense counsel affirmatively declined to object to the findings instructions and offered no additional instructions, Appellant expressly and unequivocally acquiesced to them, constituting waiver. *See United States v. Rich*, 79 M.J. 472, 476 (C.A.A.F. 2020) (citation omitted).

Finding waiver, we next consider whether to pierce Appellant's waiver relating to the instructions on the elements of Specifications 1 and 3. Having reviewed the entire record, and mindful of our mandate to "approve only that which 'should be approved,'" we have determined to leave intact Appellant's waiver of the alleged error. *See Chin*, 75 M.J. at 223.

## C. Trial Counsel's Findings Argument

Appellant claims the trial counsel committed prosecutorial misconduct through improper argument when he: (1) misstated the law and misapplied the facts to the law, (2) attacked the defense counsel's integrity, and (3) improperly vouched for evidence. Trial defense counsel did not object to trial counsel's arguments detailed above. Therefore, we review for plain error. We find no relief is warranted.[7]

### 1. Law

"Trial prosecutorial misconduct is behavior by the prosecuting attorney that 'oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense.'" *United States v. Fletcher*, 62 M.J. 175, 178 (C.A.A.F. 2005) (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). "Prosecutorial misconduct can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996) (citing *Berger*, 295 U.S. at 88).

We review claims of prosecutorial misconduct and improper argument de novo. *See United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019). "When a party does not object to comments by the prosecutor during voir dire, opening statement, argument on the findings, or argument on the sentence, we review for plain error." *United States v. Palacios Cueto*, 82 M.J. 323, 333 (C.A.A.F. 2022) (citations omitted).

> Plain error occurs when (1) there is error, (2) the error is clear or obvious, and (3) the error results in material prejudice to a substantial right of the accused. Thus, we must determine: (1) whether trial counsel's arguments amounted to clear, obvious error; and (2) if so, whether there was a reasonable probability that, but for the error, the outcome of the proceeding would have been different.

---

[7] We have carefully considered all claims Appellant raised in assignment of error (4); some compel discussion, but none warrant relief. *See Matias*, 25 M.J. at 361.

*Voorhees*, 79 M.J. at 9 (internal quotation marks and citations omitted). "[T]he best approach for assessing the prejudice from prosecutorial misconduct 'involves a balancing of three factors: (1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Palacios Cueto*, 82 M.J. at 334 *(*quoting *Fletcher*, 62 M.J. at 184). The burden to establish plain error, including prejudice, is on the appellant. *Id.* "[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

In presenting argument, trial counsel may "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000) (citation omitted). Trial counsel may strike hard but fair blows, but may not "inject his personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citations omitted). In determining whether trial counsel's comments were fair, we examine them in the context in which they were made. *Gilley*, 56 M.J. at 121. We do not "'surgically carve' out a portion of the argument with no regard to its context." *Baer*, 53 M.J. at 238.

### 2. Additional Background and Analysis

#### a. Misstatement of the Law and Facts

Appellant claims trial counsel misstated the definition of "sexual act" in relation to Specification 3. He asserts "the law defines 'sexual act'—in the context of penile penetration—as requiring 'the penetration, however slight, of the penis into the vulva or anus or mouth,'" and cites to the military judge's instructions in support.

The military judge instructed, *inter alia*, that the meaning of "sexual act" in Specification 3 included "the penetration, however slight, of the penis into the vulva, or anus or mouth," "contact between the mouth and the penis, vulva, scrotum or anus," or "the intentional touching not through the clothing of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." Appellant does not challenge the military judge's instructions on this point.

Appellant takes issue with the italicized part of the following portion of trial counsel's argument:

> Specification 3, penetrating Megan's vulva with his penis. Now
> we have to prove that he attempted to penetrate Megan's 14-

year-old vulva with his penis. Overt act, specific intent, substantial step but for. Same thing, [Specifications] two through four. How does he do it, "Well, I want to lick and suck until you're nice and wet, then I want to slap my thing—his penis—on your thing," her 14[-]year-old vulva, "to see if you're ready." You'll see in the instructions *contact is all that's required. In order to commit the offense, contact one sexual organ to another*. "Then I will start rubbing my tip between your slit." His 43-year-old penis on her 14-year-old vulva.

Trial counsel then read more quotes from Appellant's Kik messages to Megan, indicating Appellant planned penile/vaginal penetration and not mere contact:

"My favorite is doggie." Doggie style, right. We have missionary and we have doggie style. This is actual sex that he is telling her he wants to do. Sexual assault of a child. "Best view." "I get to mess with your booty and legs." "Best view to see me going in and out." "Mount me like a horse while I lay on my back." "You get on top of my d[*]ck and stick it in, then you move it in a way that you're bouncing."

We understand Appellant's argument to be that, although a "sexual act" can be "the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with the proscribed intent," *see MCM*, pt. IV, ¶ 62.a.(h)(1), because Appellant was charged with an attempted penile/vaginal penetration, "sexual act" in this case required "the penetration, however slight, of the penis into the vulva," *see MCM*, pt. IV, ¶¶ 62.a.(h)(1), 60.a.(g)(1)(A). We find trial counsel's argument was based on one of the military judge's definitions of "sexual act" and was not improper.

We conclude trial counsel did not misstate the law that the military judge provided to the court members.[8] Trial counsel outlined graphic evidence of Appellant's sexual intent before stating: "You'll see in the instructions contact is all that's required. In order to commit the offense, contact one sexual organ to another." After this single reference to contact being required for Specification 3, trial counsel then provided several examples of Appellant describing not just contact but penetrative sexual acts. Thus, while trial counsel recited an inaccurate definition of "sexual act" for the particular charging scheme in Appellant's case, he provided examples that supported an accurate definition based

---

[8] Appellant does not assert the military judge's definitions of "sexual act" with respect to Specification 2 of Charge II were erroneous.

on the allegation in Specification 3: the penetration, however slight, of the penis into the vulva.

Additionally, Appellant claims trial counsel misapplied the facts to the elements of Specification 3. During argument, trial counsel specifically noted that the communications Appellant intentionally made to Megan about what they would do upon their meeting were the overt acts leading to Appellant's attempt to commit sexual abuse of a child. Additionally, he argued that Appellant's drive to a designated location in enlisted housing to meet Megan and possession of newer condoms were a "substantial step." Appellant explains the alleged error:

> Essentially, the trial counsel misapprehended the elements of attempt and split them into (1) an overt act, *and* (2) a substantial step. It is obvious from the trial counsel's argument that he believed [Appellant]'s overt act (sending indecent messages) and his substantial step (driving to the meet up location) were *not* the same action.

We find trial counsel's arguments about "overt acts" and "substantial steps" potentially were confusing but were not improper. While he may have created an unnecessary distinction, his argument is best understood to highlight multiple acts of Appellant that were a substantial step towards commission of the charged offense, including the acts of driving to enlisted housing with condoms.

In a similar vein, Appellant claims that, in relation to Specification 3, trial counsel argued that the overt act of sending indecent messages was done with the specific intent to send those messages, not the specific intent to sexually assault. Appellant emphasizes the italicized part of the following portion of trial counsel's argument:

> *This is the overt act. The overt act is sending the message to the 14-year-old girl.* The *specific intent* is right there. What's in his mind? We know because he specifically intended to do *these things*.

> What's a substantial step? Well, you can use the substantial step of him driving from his house to enlisted housing. But there's more here. There's another substantial step that I hope you'll consider. I hope you think about. It's the condoms.

We do not agree with Appellant's interpretation. While trial counsel misused the phrase "overt act" when he argued evidence of specific intent, we read his argument to convey that the messages show what sexual acts Appellant had the specific intent to commit upon Megan when they met. Such inference from the evidence is reasonable under these circumstances.

### b. Attack on Defense Counsel's Integrity

During Appellant's conversation with Megan, the topic of his genitalia being shaved for their rendezvous was raised. After apprehending him, AFOSI agents, including SA TN, photographed Appellant's genitalia.[9]

Trial counsel asked SA TN at the end of direct examination what hair he observed in Appellant's pubic area. SA TN responded, "[T]he top portion above the penis had a little bit of pubic hair there. Looking at the testicles and the sac area, it appeared to be completely shaved, or no hair, however you want to describe it." Defense counsel began her cross-examination of SA TN where trial counsel left off. She showed SA TN one photo to refresh his memory, then asked, "Did it appear [Appellant] had shaved?" SA TN replied, "No, ma'am." The Defense did not offer this photograph into evidence. In an Article 39(a), UCMJ, session before its re-direct examination, the Government declared it now sought to admit four photos AFOSI agents took of Appellant's genitalia. To overcome a Defense objection, trial counsel argued that they had not intended to introduce the photographs, "to have decency to [Appellant]." With the Defense's cross-examination of SA TN, however, trial counsel argued the court members—and, to some extent, SA TN—had been misled. Moreover, the Government argued: "Part of our theory is that the substantial step was for [Appellant] to shave his hair" and the photographs were evidence of that step. The military judge overruled the Defense's objection and allowed the Government to enter the photographs into evidence.

In claiming prosecutorial misconduct, Appellant emphasizes the italicized portions of the following statements from trial counsel's findings arguments:

> I'm going to stop here and pause and talk about this just for a moment. During direct and cross-examination of Special Agent [TN], when we put him up on the stand, we specifically intended to ask him questions about this and to not get into any pictures. We didn't want to embarrass [Appellant]. We didn't want to invade in his privacy. But what you will notice is when he was on cross-examination, Defense gave him one picture, just one. And the one picture they gave him was of what appeared to be the top area not shaved. It was *an attempt to mislead*. So, our intent to not embarrass [Appellant], to not take his privacy away, was that *overcome by them wanting to mislead*. That's why we put those pictures in, so you can look at them yourself. You can tell whether or not he was shaved or not. He says in the messages,

---

[9] Before trial, the Government informed the Defense that it did not intend to offer the photographs into evidence.

"Do you want me to shave?" That's a substantial step. He's just coming back from deployment. He's shaving his pubic hairs to get ready so she can do oral sex on him.

In his argument, trial defense counsel stated:

And I have to respond to the trial counsel's argument here. Somehow the Defense is trying to mislead [SA TN] by providing him with a picture that he took, and asking him does this refresh his recollection from what he previously told us in a prior interview where he said there was no shaving? That's misleading him? A picture he took and asking if that refreshed his recollection? Besides the point, you have the pictures. As uncomfortable as it may be, look at them. Does it make any sense that he would shave his scrotum and nothing in between his thighs, nothing above, nothing around, just the scrotum?

In rebuttal, trial counsel argued:

So I brought it up in my close and then [defense counsel] commented on it, now I'm going to finish it out here with what happened with [SA TN]. The privacy. I already explained to you *why we did what we did* and the *misleading*. It is *misleading*, members. They gave him one picture on cross-examination. He was being cross-examined by a skilled defense attorney and they gave him one picture and asked him, "Isn't it true that in this picture he's not shaved?" They put him in that spot. They put him in a spot to really just say at that point, "Yeah, it's true." That is it. *Absolute attempt to mislead. Absolute.* There was [sic] four pictures.

And even though he took all four of them, took the one, there was [sic] four pictures. If they would've provided him with all four pictures and said, "Take a look at these pictures," then maybe [SA TN's] response is totally different. Maybe it's like, "Well in this one it looks one way but in the rest of these you can clearly see." Members, I'm not going to talk about this anymore. You have the pictures. You can look at it.

Appellant claims trial counsel improperly argued to the court members that (1) trial defense counsel tried to mislead them by showing SA TN only one photograph, and (2) the Government had not offered the photographs initially because it wanted to respect Appellant's privacy—a fact not in evidence. The Government counters that (1) trial counsel argued that trial defense counsel misled *SA TN*, not the court members, and (2) the "fleeting remark" about not

wanting to embarrass Appellant was "a fair inference from the record." Moreover, the Government maintains counsel was not "trying to win favor with the members" but instead was answering the "question in the members' minds why the Government did not introduce these photos in the first place."

Trial counsel accusing trial defense counsel of misleading the court members or SA TN was inflammatory, even if it was a fair inference based on how evidence was presented. The Prosecution's reasons for offering or not offering evidence ordinarily is not an appropriate matter for findings argument. *Cf.* R.C.M. 919(b), Discussion ("Argument may include comment about the testimony, conduct, motives, interests, and biases of witnesses to the extent supported by the evidence."). In this case, the Prosecution's reasons for not offering the photographs into evidence earlier were neither "evidence of record" nor "reasonable inferences fairly derived from such evidence." *See Baer*, 53 M.J. at 237.

### c. Improper Vouching

Appellant claims trial counsel committed prosecutorial misconduct by injecting personal opinions during findings argument. He takes issue with the italicized portions from the following portion of findings argument:

> How do you look, a 43-year-old man talking to a 14-year-old girl? Why does he care? Why does he care how she looks? He starts it. He brings it up. [SA JN] told you if he would have just communicated with him and it would have never gone sexual, this wouldn't be a case at all. [SA JN], fresh off his ICAC training, was doing exactly what he thought was right within the left and the right boundaries. He had supervision. His leadership was talking to him every day. In fact, he won an award. He got a commendation medal. [Defense counsel] told you that. *They don't give commendation medals to people for violating rights, for entrapping people.* "Send me a pic." How many times did he say "Send me a pic?" "Send me a pic." "Send me a pic." "I want to get rock hard." He started it. Skout, page 8, very beginning. This is him. This is [Appellant].
>
> . . . .
>
> Thirty-three years old. I'm going to touch on this just for a second. So on one of the very first messages he tells her, "I'm 33 years old." [Defense counsel] has implied that was a fat finger, like an accident. 33 instead of 43. You'll find that it actually comes up twice. Page 2 of Skout and then page 32 of Kik. Coincidence? Who knows? *I think not. What I think is this*: She's a 14-year-old girl, he's a 43-year-old man. To a 14-year-old girl,

someone in their 20's is kind of cool, right? That's cool. He's in college. Someone in their 30's, still maybe kind of cool. That's not too old. Forties, someone in their 40's. That's too old. It's kind of gross, right? So he intentionally takes 10 years off his life to make himself more appealing to her. He didn't fat-finger it. He did it twice. Why did he do it? Because he knew if he said 43 she wouldn't be interested anymore. She would lose interest.

During cross-examination, trial defense counsel asked SA JN about how maintaining his conversations with Appellant was "taxing," and included working "into nights and weekends." He then asked: "And based on this, you received accolades for your work in this, correct? You were able to get an [enlisted performance report] bullet out of this, correct?" to which SA JN replied, "I got a performance report bullet." During a redirect examination, trial counsel asked SA JN whether he "ever receive[d] any feedback or criticism from [AF]OSI at any level that [he had] done anything wrong here" to which SA JN replied: "I received no feedback or any criticism, sir." SA JN did not testify about receiving a commendation medal.

Trial counsel argued facts not in evidence when he commented on SA JN receiving a medal. What a prosecutor "thinks" during argument is not an appropriate consideration for the court members. In this case, we find that trial counsel twice saying "I think" when implying that Appellant lied to Megan about his age was an inartful way to introduce fair inferences the court members could draw from the evidence and a call upon their knowledge of human nature and the ways of the world.

### d. Prejudice

Assuming that trial counsel's arguments outlined above were clear or obvious error, we considered the three *Fletcher* factors, *see* 62 M.J. at 184, and find no prejudice. Read as a whole, trial counsel's misstatement of the law or facts in findings argument did not create confusion. Trial defense counsel did not object nor ask the military judge for an instruction to cure any of the alleged errors. Regarding the "misleading" photographs, trial defense counsel chose to address the matter directly with the court members, thereby minimizing the impact of trial counsel's error. Finally, whether Appellant was shaven and why the Government only later offered photographic proof thereof, the significance of SA JN getting accolades for his efforts, and whether Appellant reduced his age by ten years were of minimal weight compared to the extensive evidence of Appellant's indecent communications with Megan and his efforts to meet her for sex. We find there was no reasonable probability that, but for the alleged errors, the outcome of the proceeding would have been different. Therefore, we conclude that any error during argument did not result in material prejudice to Appellant's substantial rights.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court